## IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

### AT KNOXVILLE

### MARCH 1999 SESSION

**FILED**

**October 13, 1999**

**Cecil Crowson, Jr.**
**Appellate Court Clerk**

| | | |
|---|---|---|
| **STATE OF TENNESSEE,** | * | No. 03C01-9805-CR-00193 |
| **Appellee** | * | SULLIVAN COUNTY |
| **V.** | * | Hon. R. Jerry Beck, Judge |
| **GUY WILLIAM RUSH,** | * | (Reckless Aggravated Assault) |
| **Appellant.** | * | |

For Appellant

Mark D. Harris
142 Cherokee Street
Kingsport, TN 37660

For Appellee

Paul G. Summers
Attorney General and Reporter
425 Fifth Avenue North
Nashville, TN 37243-0493

Erik W. Daab
Assistant Attorney General
425 Fifth Avenue North
Nashville, TN 37243-0493

Edward E. Wilson
Assistant District Attorney General
P.O. Box 526
Blountville, TN 37617

OPINION FILED:

AFFIRMED

NORMA MCGEE OGLE, JUDGE

**OPINION**

The appellant, Guy William Rush, appeals his conviction in the Sullivan County Criminal Court of reckless aggravated assault. The trial court sentenced the appellant as a Range III offender to ten years in the Tennessee Department of Correction. On appeal, the appellant presents the following issues for our review:

(1) Whether the trial court erroneously instructed the jury on the offense of reckless aggravated assault.

(2) Whether the trial court erred in failing to instruct the jury on the lesser offenses of attempt to commit criminally negligent homicide and felony reckless endangerment.

(3) Whether the State violated Tenn. R. Crim. P. 16 and the rule set forth in Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194 (1963), by failing to comply with the appellant's Motion for Discovery.

(4) Whether the trial court erroneously admitted evidence at trial concerning a pending charge against the appellant of custodial interference.

(5) Whether the trial court erred in failing to enforce the parties' stipulation concerning the appropriate range of punishment.

(6) Whether the trial court erroneously denied the appellant's Motion for New Trial on the basis of newly discovered evidence.

(7) Whether the evidence adduced at trial was sufficient to support the appellant's conviction of reckless aggravated assault.

Following a thorough review of the record and the parties' briefs, we affirm the judgment of the trial court.

**I. Factual Background**

On December 12, 1995, a Sullivan County Grand Jury returned a two count indictment charging the appellant in Count I with attempt to commit second

2

degree murder of Tina Cherie Rush[1] and in Count II with aggravated assault of Wendy Renee Crowe. The indictment stemmed from a fight between the appellant and his ex-wife, which occurred on October 1, 1995, in the parking lot of the Station Bar in Sullivan County. The appellant's case proceeded to trial on March 17 and 18, 1997.

At the appellant's trial, the State established that on October 1, 1995, Tina Rush and a friend, Wendy Crowe, decided to go to the Station Bar in order to play pool and watch a NASCAR race on the bar's television. They arrived at the bar at 3:00 p.m. or 3:30 p.m. Approximately three hours after their arrival, the appellant and a friend, Pete Gross, also entered the bar. The appellant and Tina Rush had been divorced for approximately three and one half years. Moreover, in 1993 and 1994, Ms. Rush had been convicted of assaulting the appellant. However, the former couple continued to encounter one another regularly, as their marriage had produced one daughter who visited the appellant every other weekend. Thus, while inside the bar, the appellant and Ms. Rush conversed amicably.

Later that evening, Mr. Gross became involved in an argument and fist fight with another customer in the bar named Jimmy "J.J." Cullop. The owner of the bar asked Mr. Gross to leave, and Mr. Gross and the appellant walked outside into the parking lot. Ms. Rush and Ms. Crowe remained in the bar for an additional amount of time between fifteen minutes and one hour.

As they were leaving the bar, Ms. Rush and Ms. Crowe paused immediately outside the entrance to speak with Mr. Cullop, who was a former

---

[1]The victim in this case is referred to elsewhere in the transcript as "Tina Louise Rush" and "Tenna Cherie Rush." However, on an "Application for Criminal Injuries Compensation" form, Ms. Rush indicated that her name is, in fact, "Tina Cherie Rush."

3

boyfriend of Ms. Rush. Both women noticed that the appellant and Mr. Gross were still in the parking lot, speaking with the owner of the bar. When the women emerged from the bar, the appellant approached them and initiated a somewhat disjointed conversation.

The appellant first asked Ms. Crowe if she would accompany him on a date. When Ms. Crowe emphatically refused, the appellant turned to his ex-wife and inquired whether or not he would see her in court the following Tuesday. Ms. Rush replied, "Yes, because I can't let you keep doing the things you do, so I will be there." Finally, the appellant turned to Mr. Cullop and spoke with him about his earlier fight with Mr. Gross. Mr. Cullop remarked that he "knowed he couldn't whoop [Mr. Gross]." The appellant responded, "I couldn't whoop him either unless I used a knife, and I've got one."

At this point, Ms. Rush apparently believed that the appellant intended to fight with Mr. Cullop and asked the appellant to leave Mr. Cullop alone. In response, the appellant placed his hand on his pocket. When Ms. Rush warned the appellant that she was carrying pepper spray, the appellant violently pushed Ms. Rush against the outside wall of the bar, prompting Ms. Crowe to intervene by pushing the appellant away from Ms. Rush. The appellant struck Ms. Crowe in the head with his fist, whereupon Ms. Rush attempted to spray the appellant with pepper spray. The appellant then struck Ms. Rush in the jaw with his fist. Ms. Crowe managed to extricate herself from the melee, retreat inside the bar, and call the police. Mr. Cullop also fled the parking lot at some point during the fight.

While Ms. Crowe was inside the bar, the appellant pulled a knife from his pocket and stabbed Ms. Rush in her right elbow and under her left breast. Ms.

Rush continued to spray the appellant with pepper spray and attempted to run away. The appellant seized Ms. Rush from behind and stabbed her twice in the back.

Ms. Crowe reemerged from the Station Bar and pulled the appellant away from Ms. Rush. The appellant made stabbing motions with his knife in Ms. Crowe's direction. However, Ms. Crowe testified at trial that the appellant's eyes were "squinted shut" and he appeared to have difficulty seeing her. Ultimately, the owner of the bar forced both Ms. Rush and Ms. Crowe back inside the bar, leaving the appellant in the parking lot.[2]

John Rose, an officer employed by the Sullivan County Sheriff's Department, was dispatched to the Station Bar at approximately 8:21 p.m. When he arrived, the appellant was standing in the parking lot with his arms outstretched. He appeared to be holding a knife in his right hand and "was screaming and hollering and thrashing his arms back and forth." Bystanders in the parking lot yelled to Officer Rose that someone inside the bar had been stabbed.

Officer Rose ordered the appellant to lie on the ground, repeating the order several times. When the appellant finally complied, Officer Rose placed him in handcuffs and retrieved both the knife and a can of pepper spray which was lying on the ground nearby the appellant. Officer Rose then confirmed that an ambulance was en route to the bar and waited for the arrival of additional officers. As soon as another officer arrived, Officer Rose entered the bar in search of the victim. The officer observed Ms. Rush lying motionless on the floor. Several people were attempting to treat wounds on her back. An ambulance then arrived and

---

[2]Although contradicted by Ms. Rush's testimony, Ms. Crowe recalled that she withdrew from the fight, entered the bar, and returned one more time before the owner of the bar intervened.

transported Ms. Rush to Bristol Regional Medical Center.

Officer Rose returned to the parking lot and advised the appellant of his Miranda rights. The appellant declined to provide a statement to the police, indicating that his eyes were "burning." Officer Rose concluded that the appellant had probably been sprayed with pepper spray, and he directed another officer to transport the appellant to the Medical Center in order to ensure that he did not require medical treatment.

At the appellant's trial, Officer Rose testified that, generally, pepper spray will cause difficulty breathing and a burning sensation in the eyes, forcing the eyelids to close. The severity of these symptoms will vary depending upon whether the pepper spray directly hits the intended target, and the symptoms can last from twenty to forty minutes. Officer Rose testified that, although pepper spray can cause panic, an individual can also overcome the effects of pepper spray, open his or her eyes, and continue to struggle and fight. Officer Rose noted that, on the "continuum of force," the use of pepper spray is one level above a verbal command and one level below the direct application of physical force, such as twisting someone's hand or wrist.

Dr. Glenn Birkitt, Jr., testified at trial that he treated Ms. Rush at the Bristol Regional Medical Center. Dr. Birkitt stated that Ms. Rush had suffered four puncture wounds: a superficial wound in her right elbow; another superficial wound in her left anterior chest; and more serious wounds in her right upper and right middle back. The last wound was the largest wound and was still bleeding actively when Dr. Birkitt examined Ms. Rush at the Medical Center. Upon performing a "CAT" scan, the doctor determined that the puncture wound was approximately six

6

centimeters in length and had penetrated the back of the liver, causing the liver to bleed into the abdominal cavity. Ms. Rush was administered fluids intravenously in order to maintain her blood volume and was transferred to the intensive care unit. Ms. Rush remained in the hospital for four days.[3]

In defense, the appellant presented the testimony of Larry A. "Pete" Gross. Mr. Gross testified that he and the appellant have been best friends since childhood. He recounted that, on the afternoon of October 1, 1995, he met the appellant at the home of a mutual acquaintance. They watched a race on television and then decided to drive "through the mountain." During their excursion, the appellant instructed Mr. Gross to drive to the Station Bar. The appellant explained that he wished to locate his ex-wife in order to obtain her permission to see their daughter that weekend.

When the appellant and Mr. Gross arrived at the Station Bar, Ms. Rush was playing pool. The appellant approached Ms. Rush and inquired concerning their daughter. Both the appellant and Ms. Rush appeared friendly during the ensuing conversation, which lasted approximately five or six minutes. Afterwards, Mr. Gross became involved in a fight with Jimmy "J.J." Cullop. The owner of the bar asked Mr. Gross and the appellant to leave the bar and escorted them outside into the parking lot. In the parking lot, the appellant and Mr. Gross conversed with the owner of the bar, who finally decided that they could return inside.

---

[3]Incidentally, Dr. Birkitt also stated that, during the course of his treatment, he noticed no signs that Ms. Rush was intoxicated. He recalled:
> At the time I saw her, she was reasonable, she was coherent and able to give me information and talk to me. There was no reason to be concerned that she was impaired in any way.

Ms. Rush herself testified that, while at the Station Bar, she only consumed one and one half Zimas. Moreover, we note that Officer Rose testified that he noticed no signs that the appellant was intoxicated on the evening of his offense.

7

Mr. Gross and the owner of the bar continued their conversation in the parking lot, but the appellant turned and walked toward the entrance of the bar. Ms. Rush, Ms. Crowe, and Mr. Cullop had followed the appellant and Mr. Gross into the parking lot and were standing just outside the entrance of the bar. According to Mr. Gross, whose view was somewhat obscured by several parked cars, Ms. Rush stopped the appellant and initiated a conversation. She soon began "screaming and . . . cussing [at the appellant]." Mr. Gross resumed his conversation with the owner of the bar, but the altercation at the entrance once again captured his attention when he heard the appellant exclaim, "You sprayed me, why did you spray me?" As noted earlier, Mr. Gross's view of the bar's entrance was obscured by several parked cars. Nevertheless, as he approached the entrance, Mr. Gross could hear the appellant saying, "[G]et away, stay back." When he arrived, the appellant was alone and kept saying, "I can't see, I'm blind, she blinded me." Mr. Gross testified that the appellant was holding a knife.

At the conclusion of the appellant's trial, the trial court instructed the jury on the following offenses pursuant to Count I of the indictment pertaining to Ms. Rush: attempt to commit second degree murder; attempt to commit voluntary manslaughter; intentional or knowing aggravated assault accompanied by serious bodily injury; reckless aggravated assault accompanied by serious bodily injury; and assault accompanied by bodily injury. With respect to Count II of the indictment pertaining to Ms. Crowe, the trial court instructed the jury on the following offenses: intentional or knowing aggravated assault by use of a deadly weapon; reckless endangerment by use of a deadly weapon; and assault by causing another to reasonably fear imminent bodily injury. The trial court additionally instructed the jury on the defenses of self-defense and necessity. Following deliberation, the jury found the appellant guilty of reckless aggravated assault with respect to Count I of

the indictment and acquitted the appellant of Count II.

## II. Analysis

**A.     Jury Instructions**

### i. Reckless Aggravated Assault

The appellant first contends that, with respect to his indictment for attempt to commit second degree murder of Ms. Rush, the trial court erroneously instructed the jury on the offense of reckless aggravated assault. The appellant correctly notes that our supreme court in State v. Trusty, 919 S.W.2d 305, 312 (Tenn. 1996), held that aggravated assault is neither a lesser grade nor a lesser included offense of attempted murder. However, because the supreme court's holding was based, in part, upon the language of the indictment in that case, the holding does not necessarily avail the appellant.

The supreme court's opinion in Trusty was grounded in the due process requirements that a criminal defendant be informed of the nature and cause of the State's accusation and afforded a fair opportunity to defend against the charges. Id. at 309. Consistent with these requirements, "an indictment or presentment must provide notice of the offense charged, an adequate basis for the entry of a proper judgment, and suitable protection against double jeopardy." Id. Relying upon these guidelines, the court concluded that a constitutionally adequate indictment for one offense will additionally provide notice of (1) all lesser offenses which, by reason of statutory construction, are lesser grade offenses, and (2) all lesser offenses which, by reason of the language in the indictment, are necessarily included in the greater offense. Id. at 310-311. Thus, a determination of lesser *included* offenses depends upon the language by which the greater offense is charged in the indictment and can only be made on a case by case basis. See,

9

e.g., State v. Flanigan, No. 03C01-9708-CR-00330, 1998 WL 338207, at *2 n.1 (Tenn. Crim. App. at Knoxville, June 26, 1998)(while aggravated assault is generally not a lesser included offense of attempted murder, the language of an indictment charging attempted murder may nevertheless allege an aggravated assault); State v. Nolan, No. 01C01-9511-CC-00387, 1997 WL 351142, at **5-6 (Tenn. Crim. App. at Nashville, June 26, 1997)(even if an indictment charges attempt to commit first degree murder, the indictment will support a conviction of aggravated assault if it alleges serious bodily injury or the use of a deadly weapon).

In this case, the indictment charged:

GUY WILLIAM RUSH on or about October 1, 1995 . . . did unlawfully, feloniously, and knowingly attempt to kill Tina Cherie Rush . . . by stabbing her several times, in violation of Tennessee Code Annotated Section 39-13-202 . . . .

The appellant contends that the indictment cannot support a conviction of reckless aggravated assault as it fails to allege the use of a deadly weapon, serious bodily injury, or a mental state of recklessness.

Initially, whether or not Count I of the indictment alleged the appellant's use of a deadly weapon is irrelevant to the resolution of this issue, because the trial court only instructed the jury on the offense of reckless aggravated assault accompanied by serious bodily injury. Specifically, the trial court instructed the jury that the State was required to prove beyond a reasonable doubt that the appellant (1) recklessly caused bodily injury to Ms. Rush and (2) the bodily injury was serious. Tenn. Code. Ann. § 39-13-102(a)(2)(A) (1995); Tenn. Code. Ann. § 39-13-101(a)(1) (1995).

Moreover, Tenn. Code. Ann. § 39-11-301 (1997) and the

10

accompanying Sentencing Commission Comments provide that greater levels of culpability encompass the lesser. See, e.g., State v. Brantley, No. 01C01-9508-CC-00255, 1997 WL 110008 (Tenn. Crim. App. at Nashville, March 13, 1997)(this court held that an indictment charging intentional or knowing aggravated assault could support a conviction of reckless aggravated assault). Accordingly, the mental state of "knowingly" charged in the indictment at issue encompassed the necessary mental state of "recklessness."

Thus, with respect to the trial court's instruction on reckless aggravated assault, the only question before this court is whether the indictment alleged serious bodily injury. Again, in reviewing an indictment, "the touchstone for constitutionality is adequate notice to the accused." State v. Hill, 954 S.W.2d 725, 729 (Tenn. 1997). Adequate notice entails factual allegations relating to each essential element of the offense. Trusty, 919 S.W.2d at 309. See also State v. Cutshaw, 967 S.W.2d 332, 338 (Tenn. Crim. App. 1997)("[a] judgment based on an indictment or presentment that does not allege all the essential elements of the offense is a nullity"). Moreover, the indictment must state the facts in ordinary and concise language, enabling a person of "common understanding" to know what is intended. Trusty, 919 S.W.2d at 309; Tenn. Code. Ann. § 40-13-202 (1997). That having been said, our supreme court explained in Trusty "that in some instances, where an element is implicit although not specifically stated in the indictment, a conviction may be sustained." 919 S.W.2d at 312-313; Hill, 954 S.W.2d at 729 ("the required mental state may be inferred from the nature of the criminal conduct alleged [in the indictment]"). See also State v. Palmer, No. 01C01-9607-CR-00285, 1997 WL 722789, at *10 (Tenn. Crim. App. at Nashville, November 20, 1997), perm. to appeal denied, (Tenn. 1998). We conclude that a person of common understanding would interpret the language in the indictment charging the appellant

11

with knowingly "stabbing" the victim "several times" to include the essential elements of reckless aggravated assault, including serious bodily injury.

Tenn. Code. Ann. § 39-11-106(a)(34) (1995) defines "serious bodily injury" as "bodily injury which involves:

(A)    A substantial risk of death;
(B)    Protracted unconsciousness;
(C)    Extreme physical pain;
(D)    Protracted or obvious disfigurement; or
(E)    Protracted loss or substantial impairment of
        a function of a bodily member, organ or
        mental faculty . . . ."

The language of the indictment in this case provided sufficient notice to the appellant that the State was alleging injuries which either created a substantial risk of death or caused "[e]xtreme physical pain." In reaching this conclusion, we note that the common dictionary definition of "stab" is "to pierce or wound with or as if with a pointed weapon . . . . to thrust, plunge, or jab (a knife, pointed weapon, or the like) into something . . . . to penetrate sharply or painfully . . . . Random House Webster's Unabridged Dictionary 1852 (2d ed. 1998). Moreover, the indictment in this case alleged that the appellant stabbed the victim more than once, logically increasing any accompanying risk of death or any pain. This issue is without merit.

### ii.    Attempt to Commit Criminally Negligent Homicide and Felony Reckless Endangerment

The appellant next alleges that the trial court erroneously failed to instruct the jury on the offenses of attempt to commit criminally negligent homicide and felony reckless endangerment. A trial court in a criminal case is required by statute to instruct the jury on the general principles of law relating to each offense

12

included in the indictment, even absent a request by the defendant.[4]  Tenn. Code.

Ann. § 40-18-110(a) (1997).  See also State v. Cleveland, 959 S.W.2d 548, 553

(Tenn. 1997); State v. Elder, 982 S.W.2d 871, 876 (Tenn. Crim. App. 1998).

Therefore, when the evidence introduced at trial is legally sufficient to support a

conviction of a lesser grade or lesser included offense, a criminal defendant is

entitled to a jury instruction on the lesser offense.  Trusty, 919 S.W.2d at 311;

Cutshaw, 967 S.W.2d at 341-342; State v. Cowart, No. 03C01-9512-CR-00402,

1999 WL 5174, at *15 (Tenn. Crim. App. at Knoxville), perm. to appeal denied,

(Tenn. 1999).  See also State v. Williams, 977 S.W.2d 101, 105 (Tenn. 1998).

Of course, as noted above, the trial court must first determine whether

a requested instruction sets forth a lesser offense of the offense charged in the

indictment.  Elder, 982 S.W.2d at 876.  In this case, the trial court correctly

determined that attempt to commit criminally negligent homicide is not a lesser

offense of attempt to commit second degree murder, because the former offense

does not exist in Tennessee.  State v. Mooney, No. 02C01-9508-CC-00216, 1998

WL 906477, at *4 (Tenn. Crim. App. at Jackson, December 30, 1998); State v.

Nolan, No. 01C01-9511-CC-00387, 1997 WL 351142, at *9 (Tenn. Crim. App. at

Nashville, June 26, 1997).  Cf. State v. Kimbrough, 924 S.W.2d 888, 891-892

(Tenn. 1996)("[i]t is impossible to conceive of an attempt where a crime by definition

may be committed recklessly or negligently but not intentionally").

In contrast, in light of the language in Count I of the indictment, we

must conclude that, in this case, felony reckless endangerment is a lesser included

---

[4]The record reflects that the appellant's trial counsel did request instructions on the offenses of attempt to commit criminally negligent homicide and reckless endangerment, but the trial court denied the appellant's request.  Trial counsel subsequently emphasized his objection to the trial court's failure to charge the offense of reckless endangerment with respect to Count I of the indictment.

13

offense of attempt to commit second degree murder. Compare State v. Bentley, No. 02C01-9601-CR-00038, 1996 WL 594076, at *1-2 (Tenn. Crim. App. at Jackson, October 17, 1996)(this court implicitly acknowledged that, in that case, reckless endangerment was neither a lesser grade nor lesser included offense of attempt to commit first degree murder). Again, the indictment charged the appellant with knowingly stabbing Ms. Rush several times. A person commits reckless endangerment "who recklessly engages in conduct which places or may place another person in imminent danger of death or serious bodily injury. Tenn. Code. Ann. § 39-13-103(a)(1997). When the offense of reckless endangerment is committed with a deadly weapon, the offense is a class E felony. Id. at (b). Just as a person of common understanding would interpret the language "by stabbing her several times" to imply serious bodily injury to the victim, she would similarly understand the language to encompass the imminent danger of death or serious bodily injury. Moreover, we conclude that the use of a deadly weapon is implicit in this language.

Having concluded that felony reckless endangerment is a lesser included offense of attempt to commit second degree murder, we must also determine whether an instruction on the lesser included offense was warranted by the evidence adduced at trial. Elder, 982 S.W.2d at 876-877. The relevant question is whether "the evidence, when viewed in the light most favorable to the defendant's theory of the case, would justify a jury verdict in accord with the defendant's theory, and would permit a rational trier of fact to find the defendant guilty of the lesser offense and not guilty of the greater offense." Id. at 877. See also State v. Langford, 994 S.W.2d 126, 128 (Tenn. 1999)(failure to instruct on a lesser offense is not error when the record is devoid of any evidence permitting an inference of guilt of the lesser offense); State v. Lewis, 978 S.W.2d 558, 565 (Tenn. Crim. App.

14

1997), perm. to appeal denied, (Tenn. 1998)("[o]nly when there is some evidence upon which reasonable minds could convict the defendant of a particular lesser offense is the court required to instruct regarding that offense").

In this case, the primary distinction between reckless endangerment and reckless aggravated assault (other than the use of a deadly weapon, which was undisputed at trial) was the distinction between the imminent danger of death or serious bodily injury and the realization of that danger in the form of serious bodily injury creating a substantial risk of death or extreme physical pain. In other words, this court must ask whether a rational trier of fact could have found the appellant guilty beyond a reasonable doubt of merely placing Ms. Rush in danger of death or serious bodily injury and acquitted the appellant of inflicting serious bodily injury upon Ms. Rush.

As noted earlier, the evidence at the appellant's trial established that the appellant became embroiled in a physical altercation with his ex-wife and, upon being sprayed with pepper spray, withdrew a knife and stabbed Ms. Rush four times. The most serious wound was six centimeters in length and penetrated Ms. Rush's liver. Ms. Rush was placed in the intensive care unit at Bristol Regional Medical Center and remained in the hospital for four days. Ms. Rush testified that, during the incident, she was "in a lot of pain" and believed that she was dying. She stated that, at the time of the appellant's trial, she was still experiencing some residual pain as a result of her injuries. Dr. Birkitt confirmed that the injuries would have been painful. Dr. Birkitt additionally testified that Ms. Rush reported to him at the hospital that, following the appellant's attack, she "was notably uncomfortable" and "had pain in her chest and back." Dr. Birkitt stated that at no time did Ms. Rush experience clinical shock, and her vital signs, including her blood pressure, her

15

pulse, and her respiration, remained within normal range. Viewing this evidence in a light most favorable to the appellant, we must conclude that rational jurors could have disagreed concerning the extent of Ms. Rush's injuries.

However, although we have concluded that the appellant was entitled to an instruction on the lesser included offense of felony reckless endangerment, our analysis is not complete. We must still determine whether the trial court's error affirmatively appears to have affected the result of the trial on the merits, or, in other words, whether the error more probably than not affected the judgment to the appellant's prejudice. Williams, 977 S.W.2d at 105; Tenn. R. App. P. 36(b); Tenn. R. Crim. P. 52(a). In Williams, 977 S.W.2d at 101, the defendant was indicted for the offense of first degree premeditated murder. At trial, in addition to instructing the jury on the offense of first degree murder, the trial court instructed the jury on the lesser included offenses of second degree murder and reckless homicide. Id. at 106. The trial court erroneously declined to instruct the jury on the lesser offense of voluntary manslaughter. Id. The jury convicted the defendant of first degree murder. Id. Our supreme court concluded that the trial court's error was harmless, because the jury's "disinclination to consider the lesser included offense of second degree murder clearly demonstrate[d] that it certainly would not have returned a verdict on voluntary manslaughter." Id. In other words, by finding the defendant guilty of the highest offense to the exclusion of the immediately lesser offense, the jury necessarily rejected all other lesser offenses. Id. Unfortunately, the analysis of our supreme court in Williams does not neatly fit the facts of this case, because felony reckless endangerment, had it been charged, would itself have been the immediately lesser offense. Therefore, arguably, the jury's rejection of the lesser offense of assault says nothing about whether it would have returned a verdict on felony reckless endangerment.

16

Yet, we have already noted that the key distinction between felony reckless endangerment and reckless aggravated assault as instructed in this case was the distinction between the mere possibility of death or serious bodily injury and the realization of serious bodily injury. The key distinction between assault and reckless aggravated assault was the distinction between bodily injury and serious bodily injury. Ms. Rush unquestionably suffered bodily injury. Therefore, regardless of whether the trial court charged felony reckless endangerment, assault, or both, the only question before the jury in choosing between reckless aggravated assault and any lesser offense was whether Ms. Rush suffered serious bodily injury. The jury found that Ms. Rush suffered serious bodily injury.

In Williams, our supreme court did not limit its holding to the facts of that case, but appeared to announce a broader principle that a trial court's failure to instruct on lesser offenses is subject to the harmless error analysis set forth in Tenn. R. App. P. 36(b) and Tenn. R. Crim. P. 52(a). Somewhat inconsistently, the supreme court more recently remarked that "[t]he failure to instruct on a lesser offense . . . may be shown to be harmless *beyond a reasonable doubt* under some circumstances." State v. Bolden, 979 S.W.2d 587, 592 (Tenn. 1998)(emphasis added). In any event, we conclude that the trial court's error in this case was harmless beyond a reasonable doubt.

B. **The State's Failure to Comply with the Appellant's Motion for Discovery**

    **i. The State's Failure to Provide the Criminal Record of Wendy Crowe**

The appellant additionally alleges that the State withheld information that one of its witnesses, Wendy Crowe, had been convicted of misdemeanor theft

in 1993.[5]  Prior to trial, the appellant submitted a Motion for Discovery, requesting that the State provide the criminal records of any witnesses for the State following direct examination of the witness at trial.  The appellant contends that the State's compliance with this request was mandated by Tenn. R. Crim. P. 16 and the United States Supreme Court's decision in Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194 (1963).

Initially, our supreme court has held that the State has no duty, either under Tenn. R. Crim. P. 16 or pursuant to decisional law in this state, to secure and deliver to a criminal defendant the arrest histories, if any, of the State's witnesses. State v. Workman, 667 S.W.2d 44, 51 (Tenn. 1984).  See also State v. King, 905 S.W.2d 207, 212 (Tenn. Crim. App. 1995), overruled on other grounds by Williams 977 S.W.2d at 106 n.7(this court held that the criminal history of a witness for the State is not the kind of information the State has a duty to produce pursuant to Tenn. R. Crim. P. 16); State v. Dunlap, No. 02C01-9801-CC-00009, 1998 WL 641338, at *4 (Tenn. Crim. App. at Jackson, September 21, 1998)(the State is not required to provide a defendant with the criminal records of the State's witnesses). However, this court must still address whether the State possessed such a duty pursuant to federal constitutional law.

In Brady v. Maryland, 373 U.S. at 87, 83 S.Ct. at 1196-1197, the United States Supreme Court held that the State has a duty pursuant to principles of due process to furnish exculpatory evidence to an accused.  In United States v. Bagley, 473 U.S. 667, 676, 105 S.Ct. 3375, 3380 (1985), the Supreme Court clarified that the Brady rule encompasses impeachment evidence.  However, before

---

[5]At the hearing on the appellant's Motion for New Trial, the appellant introduced a copy of the judgment of conviction, reflecting that, on December 15, 1993, Ms. Crowe was convicted in the General Sessions Court of Sullivan County of misdemeanor theft.

the appellant is entitled to relief pursuant to the Brady rule, he must establish the following prerequisites: (a) the appellant must have submitted a proper request for the production of evidence, unless the evidence was obviously exculpatory in nature and would have been helpful to the appellant; (b) the prosecution must have suppressed evidence; (c) the suppressed evidence must have been favorable to the accused; and (d) the evidence must have been material. See State v. Edgin, 902 S.W.2d 387, 389 and 390 (Tenn. 1995); Irick v. State, 973 S.W.2d 643, 657 (Tenn. Crim. App. 1998); State v. Welcome, No. 03C01-9709-CR-00386, 1998 WL 832433, at *10 (Tenn. Crim. App. at Knoxville), perm. to appeal denied, (Tenn.), cert. denied, __ U.S. __, 119 S.Ct. 219 (1998). The appellant carries the burden of proving a Brady violation by a preponderance of the evidence. Edgin, 902 S.W.2d at 389.

It is undisputed in this case that the appellant submitted a request for the criminal records of all witnesses for the prosecution.[6] Moreover, it is undisputed that Ms. Crowe's criminal record constituted evidence favorable to the appellant. Ms. Crowe was the only witness for the prosecution, other than the victim, who was able to recount details of the fight between the appellant and his ex-wife. Had the State provided the appellant with Ms. Crowe's criminal record, he could have asked Ms. Crowe on cross-examination about her prior conviction of theft for the purpose of impeaching her testimony. Tenn. R. Evid. 609. See also State v. Holtcamp, 614 S.W.2d 389, 394 (Tenn. Crim. App. 1980)("[s]tealing is dishonest conduct and an offense involving such conduct is a proper subject of cross-examination); State v. Johnson, No. 02C01-9504-CC-00097, 1997 WL 80970, at *4 (Tenn. Crim. App. at Jackson, February 27, 1997)(theft is a crime involving dishonesty and is particularly

---

[6]The State notes in its brief that the appellant failed to renew his request for the disputed evidence following Ms. Crowe's testimony. However, the State cites no authority for the proposition that the appellant was required to renew his request in order to trigger the Brady rule. Indeed, assuming that the other prerequisites to application of the Brady rule were satisfied, Ms. Crowe's record was arguably the type of "obviously exculpatory" evidence which must be provided by the State even in the absence of any request by a criminal defendant.

relevant to the issue of credibility). Accordingly, the resolution of this issue turns on the questions of whether the prosecution suppressed the evidence and whether the evidence was material.

One court has recently observed that, "[a]bsent prosecutorial knowledge, by definition there can have been no government suppression of evidence." Shakur v. United States, 32 F.Supp.2d 651, 658 (S.D.N.Y. 1999). In this case, the record reflects and it is undisputed that the prosecutor was not aware of Ms. Crowe's criminal record at the time of the appellant's trial. Nevertheless, the Supreme Court in Kyles v. Whitley, 514 U.S. 419, 437, 115 S.Ct. 1555, 1567 (1995), stated that "the individual prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf in the case, including the police." In other words, "[t]he individual prosecutor is presumed to have knowledge of all information gathered in connection with the government's investigation." United States v. Paynes, 63 F.3d 1200, 1208 (2nd Cir. 1995).

In Kyles, the Court was addressing the detectives' failure in that case to provide information to the prosecutor which they had uncovered during the course of their investigation. 514 U.S. at 438, 115 S.Ct. at 1568. The Court expressed concern that permitting the prosecutor to thereby avoid the Brady rule would effectively substitute the police for the prosecutor. Id. In contrast, the appellant does not allege that police officers investigating this case were aware of Ms. Crowe's criminal record at the time of his trial, but only that the criminal record existed. It is a significant step from imputing knowledge to prosecutors of information uncovered by police during the course of a specific investigation to imputing knowledge to the prosecutor of all information possessed by the police or other government agencies. But see, e.g., Criven v. Roth, 172 F.3d 991, 996-998

(7th Cir. 1999).

More importantly, this court has previously held that, when exculpatory evidence is equally available to the prosecution and the accused, the accused must bear the responsibility of seeking its discovery. State v. Marshall, 845 S.W.2d 228, 233 (Tenn. Crim. App. 1992); State v. Moates, No. 03C01-9610-CR-00383, 1997 WL 344800, at *4 (Tenn. Crim. App. at Knoxville, June 24, 1997), perm. to appeal denied, concurring in results only, (Tenn. 1998); State v. Brewer, No. 01C01-9308-CR-00276, 1996 WL 63949, at *24 (Tenn. Crim. App. at Nashville, February 13, 1996); State v. Walls, No. 02C01-9307-CR-00140, 1995 WL 686104, at * 5 (Tenn. Crim. App. at Jackson, November 15, 1995). Thus, in Bourff v. State, No. 03C01-9705-CR-00189, 1998 WL 381970, at *3 (Tenn. Crim. App. at Knoxville), perm. to appeal denied, (Tenn. 1998), we recently declined to find a Brady violation when the State failed to provide to the defendant evidence of the victim's prior convictions in general sessions court. We observed that the convictions were a matter of public record and not in the exclusive control of the State. Id. See also, e.g., Payne, 63 F.3d at 1208 (documents that are part of the public record are not deemed suppressed if defense counsel should have known of them and failed to obtain them because of lack of diligence in his own investigation). Similarly, in this case, Ms. Crowe's prior conviction in the Sullivan County General Sessions Court was a matter of public record and available to the appellant. Tenn. Code. Ann. § 10-7-507 (1992).

Moreover, even if the State should have discovered Ms. Crowe's prior conviction and provided the information to the appellant, the evidence was not material. The relevant question is whether, in the absence of this impeachment evidence, the appellant received "a fair trial, understood as a trial resulting in a

21

verdict worthy of confidence." <u>Kyles</u>, 514 U.S. at 434, 115 S.Ct. at 1566. <u>See also</u> <u>Edgin</u>, 902 S.W.2d at 390; <u>Irick</u>, 973 S.W.2d at 657. We conclude that the proceedings in the instant case satisfy this standard. This issue is without merit.

### ii. Failure to Provide the Names and Addresses of all Potential Witnesses to the Offense

The appellant also alleges that the State failed to provide him with the name and address of the owner of the Station Bar, one Richard Ellis, the name and address of Jimmy "J.J." Cullop, and, possibly, the names and addresses or "other eyewitnesses of whom the State is aware but has not informed [the appellant]." In his pre-trial Motion for Discovery, the appellant asked that the State provide "the names and addresses of all persons known to the District Attorney General or other law enforcement officers to have been present at the time and place of the alleged offense." Again, the appellant contends that the State's compliance with this request was mandated by Tenn. R. Crim. P. 16 and <u>Brady v. Maryland</u>, 373 U.S. at 83, 83 S.Ct. at 1194.

Initially, Tenn. R. Crim. P. 16 does not require nor authorize pretrial discovery of names and addresses of witnesses for the State, much less possible or potential witnesses. <u>State v. Harris</u>, 839 S.W.2d 54, 69 (Tenn. 1992); <u>State v. Jones</u>, No. 02C01-9703-CC-00120, 1997 WL 777077, at *8 (Tenn. Crim. App. at Jackson, December 18, 1997), <u>perm. to appeal denied</u>, (Tenn. 1998).[7] However, the <u>Brady</u> rule encompasses information about or statements of witnesses which are favorable to a defendant. <u>Smith v. State</u>, No. 02C01-9801-CR-00018, 1998 WL 899362, at *6 (Tenn. Crim. App. at Jackson, December 28, 1998), <u>perm. to appeal</u>

---

[7]The State correctly notes that Tenn. Code. Ann. § 40-17-106 (1997) is inapplicable, as the State did not present the testimony of either Mr. Ellis or Mr. Cullop at trial, nor is there any indication that the State ever intended to rely upon their testimony.

granted, (Tenn. 1999); Payne v. State, No. 02C01-9703-CR-00131, 1998 WL 12670, at *5 (Tenn. Crim. App. at Jackson), perm. to appeal denied, (Tenn. 1998). Nevertheless, the appellant in this case has utterly failed to demonstrate that the State suppressed any favorable and material evidence. See Edgin, 902 S.W.2d at 389, 390; Irick, 973 S.W.2d at 657; Welcome, No. 03C01-9709-CR-00386, 1998 WL 832433, at *10. Compare Marshall, 845 S.W.2d at 230-234 (this court found a clear violation of Brady when the State withheld a list of witnesses who could possibly have exonerated the defendant and statements by those witnesses which both corroborated the defendant's alibi and identified a possible alternative perpetrator). Indeed, the appellant has failed to explain why this information would not have been equally available to his attorney as well as the prosecutor. Marshall, 845 S.W.2d at 233; Moates, No. 03C01-9610-CR-00383, 1997 WL 344800, at *4; Brewer, No. 01C01-9308-CR-00276, 1996 WL 63949, at *24; Walls, No. 02C01-9307-CR-00140, 1995 WL 686104, at * 5. This issue is without merit.

**C.    The Admission at Trial of Testimony Concerning the Pending Charge Against the Appellant of Custodial Interference**

The appellant additionally argues that the trial court erroneously permitted Ms. Rush to testify concerning a charge of custodial interference pending against the appellant. The trial court conducted a hearing out of the presence of the jury pursuant to Tenn. R. Evid. 404(b) and determined that the proposed testimony was relevant to the appellant's motive for the charged offense and that the probative value of the disputed testimony was not outweighed by the danger of unfair prejudice.

Rule 404(b) governs the admission at trial of evidence of a person's other crimes, wrongs, or acts as substantive evidence. A trial court should only admit evidence of other crimes, wrongs, or acts if relevant to issues such as motive,

intent, identity, rebuttal of accident or mistake defenses, and the existence of a larger continuing plan, scheme, or conspiracy of which the crime on trial is a part. State v. Hall, 958 S.W.2d 679, 707 (Tenn. 1997), cert. denied, __ U.S. __, 118 S.Ct. 2348 (1998). Assuming the trial court's compliance with the procedural requirements of Rule 404(b), its application of the rule will not be disturbed on appeal absent an abuse of discretion. State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997).

The record in this case warrants deference to the trial court's evidentiary ruling. During the appellant's trial, Ms. Rush testified before the jury that, immediately prior to assaulting her, the appellant inquired concerning a pending court hearing which they were both to attend the following week. According to Ms. Rush, she informed the appellant that she would attend the hearing. She further remarked to the appellant, " . . . I can't let you keep doing the things you do, so I will be there." Contrary to the appellant's assertion, the jury was never informed of the nature of the court proceedings, only that the appellant and his ex-wife were engaged in an ongoing legal dispute at the time of the appellant's offense. We agree with the trial court that Ms. Rush's testimony was relevant to the appellant's motive and, accordingly, his intent to commit the offense of attempted second degree murder. Moreover, it is readily apparent that the extremely limited testimony at issue in no way prejudiced the appellant.

**D.    The Parties' Stipulation Concerning the Appropriate Range of Punishment**

The appellant next contends that, during the appellant's trial, the parties stipulated that, if convicted, he would be sentenced as a Range II offender. Moreover, the appellant asserts that, in reliance upon this stipulation, he waived his statutory right to an instruction pursuant to Tenn. Code Ann. § 40-35-201(b)

(Repealed, May 18, 1998) on the possible penalties for the charged offenses. The appellant concludes that the trial court's failure to enforce the parties' stipulation and the court's imposition of a Range III sentence are inconsistent with general principles of sentencing set forth in Tenn. Code. Ann. § 40-35-102 (1997), including the pursuit of justice and fair and consistent treatment of all criminal defendants. The appellant does not otherwise challenge his sentence.

The record reflects that, on March 26, 1996, the State submitted a "Notice of Intent to Seek Enhanced Punishment and To Inquire About Prior Convictions If Defendant Elects to Testify," which notice was amended on March 29, 1996. The amended notice set forth the following felony offenses:

1. One count of attempt to commit armed robbery and one count of use of a firearm on January 22, 1983, in Washington County, Virginia.
2. Petit larceny on November 25, 1985, in Sullivan County, Tennessee.
3. Sale of Marijuana on October 11, 1991 in Sullivan County, Tennessee.
4. One count of sale of marijuana and one count of sale of cocaine on October 14, 1991, in Sullivan County, Tennessee.
5. One count of sale of marijuana on October 18, 1991, in Sullivan County, Tennessee.

On the first day of the appellant's trial, immediately prior to the commencement of the trial, defense counsel filed a motion with the trial court[8] asking the trial court to instruct the jury pursuant to Tenn. Code. Ann. § 40-35-201(b) on the possible penalties for the charged offenses of attempt to commit second degree murder in Count I and intentional or knowing aggravated assault in Count II. While discussing the possible penalties for the charged offense of attempt

---

[8]Although the record of the trial proceedings reflects that a written motion was filed with the trial court, this motion is not included in the record. At the sentencing hearing, the parties debated whether a written or oral motion had been submitted to the court.

to commit second degree murder, defense counsel observed that he had received notice of the appellant's status as a Range II offender and argued that the trial court should only instruct the jury on the possible penalties within Range II. The trial court disagreed. He indicated that, although he would not instruct the jury on possible penalties for attempt to commit second degree murder exceeding Range II, he would instruct the jury on possible penalties for that offense below Range II. The trial court explained that the State might fail to prove the appellant's Range II status at the sentencing hearing. The trial court then asked defense counsel to submit a proposed instruction.

Subsequently, following testimony by several witnesses for the prosecution, the parties resumed their discussion with the trial court concerning the proposed instruction pursuant to Tenn. Code Ann. § 40-35-201(b). The following exchange between the trial court, the prosecutor (General Wilson), and defense counsel (Mr. Spivey)[9] ensued:

| | |
|---|---|
| The Court: | Now, what I said a while ago, I'm assuming the parties don't have any stipulations as to what range, what length, mitigated, Range I, Range II, that the parties haven't reached any stipulation? |
| General Wilson: | We haven't, but I think -- as Mr. Spivey mentioned earlier, I think we can stipulate that he would be Range II based upon . . . |
| The Court: | Couldn't be more than Range II? |
| General Wilson: | Could not be more than Range II. |
| The Court: | Right. Because you haven't filed sufficient notice to make him anything other than a multiple offender. |
| General Wilson: | That's right, my -- my notice |

---

[9]The appellant was represented at trial by Richard A. Spivey and Mark D. Harris.

| | |
|---|---|
| | would -- would make him a Range II. |
| Mr. Spivey: | See, aggravated assault is not -- not eligible for safety valve reduction. So . . . |
| The Court: | Well, see, look on your chart there. |
| Mr. Spivey: | Uh-hum. (Affirmative) I am. |
| The Court: | Okay, it's got -- it breaks it down, it gives you one, then it brings it down to that level. Then it brings down to the other level. Then if you've got all of them, it brings it down. So, you can look there. Let me show you. |
| Mr. Spivey: | Yeah, I see what you're saying, that's exactly right. |
| The Court: | See, if . . . |
| Mr. Spivey: | 4.20. |
| The Court: | Right. Well, you go . . . |
| Mr. Spivey: | Maximum credit, safety valve. He won't get that. |
| The Court: | Well, you can take the safety valve out and compute it. |
| Mr. Spivey: | Can you believe they've made something so simple so difficult? That's pathetic. |
| The Court: | That's the way you got to do it. |
| Mr. Spivey: | Well . . . |
| The Court: | I was . . . |
| Mr. Spivey: | I agree . . . |
| The Court: | Well, here's the one we did in the -- remember that . . . |
| Mr. Spivey: | Bob . . . |
| The Court: | . . . disc jockey we did? |
| Mr. Spivey: | Dave Carter. |
| The Court: | That's the way -- that -- that's before it changed. I think it's got different since then. |
| Mr. Spivey: | No. No. We're going to withdraw the range of punishment request. |
| The Court: | All right. |
| Mr. Spivey: | We're taking it away. |
| The Court: | Now, I'd review anything you all submitted to me. |
| Mr. Spivey: | I -- I will state for the record that your position regarding us giving you charges had nothing to do with that decision. |
| The Court: | All right. |

27

| | |
|---|---|
| Mr. Spivey: | I don't -- yeah, I understand. No, I will not rely on that on appeal. |
| The Court: | Okay. But you have that right. You can require me . . . |
| Mr. Spivey: | I understand that, but I'm not -- we -- we don't want it. |
| The Court: | All right. |
| Mr. Spivey: | Now, we do want all the lesser included offenses. |

The parties then proceeded to debate what lesser included or lesser grade offenses the trial court should instruct to the jury.

Following the appellant's conviction of reckless aggravated assault, the trial court conducted a sentencing hearing on September 11, 1997. At the hearing, the State argued that, with respect to his conviction of reckless aggravated assault, the appellant was a Range III offender. Defense counsel objected to the imposition of a Range III sentence, citing the State's earlier stipulation. The following exchange between the trial court, the prosecutor (General Wilson), and defense counsel (Mr. Harris) ensued:

| | |
|---|---|
| General Wilson: | Well, Your Honor, please, if convicted of the charge he went to trial on, and the jury went to deliberate, if convicted of that, he would be a Range II. But, they came back with a D felony conviction, which makes him a Range III because he had five priors, but he did not have sufficient priors to count for a conviction on a A or B conviction. |
| The Court: | Did we -- yeah, because that takes a specific kind of conviction. |
| General Wilson: | Yes, sir. |
| The Court: | To Range II on it. Now, I can't remember at trial, did we discuss charging of range of punishment as to lesser and included offenses? |
| Mr. Harris: | Yes, Your Honor. Yes, Your Honor. Maybe not specifically |

|   |   |
|---|---|
| | each lesser included, but we requested the lesser included charge.  You set those out, what they would be.  It would go down to reckless aggravated assault.  It would not be a reckless endangerment because it was not a lesser included of attempted second degree, and you would give this misdemeanor assault.  And then we requested -- at that time, we requested range of punishment charge.  And at that time is when -- is when the conversation took place as to what range he was and where the charge would come from within the range. |
| The Court: | Okay. |
| Mr. Harris: | I mean if that -- if -- if that would have been the case, Your Honor, we would have elected to have the charges read as . . . |

* * *

|   |   |
|---|---|
| The Court: | Okay.  Now, but when the -- defense counsel says when this was discussed at trial, that on representation that the Defendant was a Range II Offender to the lesser included offense he was eventually convicted of, you made a strategy decision not to request range of punishment. |
| Mr. Harris: | Based on the representation, that's correct, Your Honor . . . .  I don't see how the State can say he's a Range II and then come back later now and try to say he's a Range III. |
| The Court: | Well, there's different ranges for different classes of offenses. |
| Mr. Harris: | But, we -- we were talking about the lesser includeds. |
| General Wilson: | I don't believe we were, Your Honor. |

Ultimately, the court concluded that the State's stipulation to the appellant's Range II status was solely related to the original charge of attempt to commit second degree murder and was not a stipulation to the appellant's range with respect to any lesser included offenses.

Although the appellant characterizes his claim as a challenge to his sentence, implicit in his argument is his contention that the State's misrepresentation concerning its stipulation to the appellant's status as a Range II offender and the trial court's imposition of a Range III sentence deprived him of his statutory right to have the jury know the range of punishment applicable to the charges before deciding guilt or innocence. State v. Cook, 816 S.W.2d 322, 326 (Tenn. 1991). The denial of a defendant's statutory right under Tenn. Code. Ann. § 40-35-201(b) may constitute "prejudice to the judicial process," requiring a reversal of a defendant's conviction. Id. at 326-327.

Nevertheless, whether characterized as a sentencing error or a deprivation of his statutory right to a jury instruction on possible punishments for the charged offenses, his argument depends upon the existence of a stipulation between the parties to the appellant's status as a Range II offender for purposes of the lesser included offense of reckless aggravated assault. In short, we agree with the trial court's finding that, to the extent the State stipulated to the appellant's status as a Range II offender, the stipulation did not extend to possible punishments for lesser offenses of attempt to commit second degree murder.

Our conclusion is inescapable upon a careful reading of the transcript. The prosecutor indicated a willingness to stipulate to a Range II sentence upon the trial court's resumption of a conversation about the appropriate range of punishment

for the specific offense of attempt to commit second degree murder. The conclusion that the prosecutor's proffered stipulation was limited to sentencing for this offense is buttressed by his observation to the trial court that his "Notice of Intent to Seek Enhanced Punishment" only provided notice of the appellant's status as a Range II offender. Clearly, with respect to the offense of reckless aggravated assault as opposed to attempt to commit second degree murder, the State's notice supported Range III sentencing. Moreover, contrary to the appellant's assertion at the sentencing hearing and in his brief, neither the trial court nor the parties had yet determined the lesser offenses of attempt to commit second degree murder when the prosecutor proffered the disputed stipulation.

We additionally note in passing that the record arguably does not support the existence of *any* stipulation, much less the stipulation alleged by the appellant. Generally, stipulations are favored and should be encouraged and enforced by the courts, since they expedite the business of the courts. State v. Ford, 725 S.W.2d 689, 691 (Tenn. Crim. App. 1986). It is all the more important, therefore, for counsel to ensure that the existence and scope of any stipulation is clearly reflected in the record. In this case, although the State indicated a willingness to stipulate to the appellant's status as a Range II offender with respect to the charge of attempt to commit second degree murder, defense counsel did not indicate the appellant's agreement to forego any future challenge to his Range II status before waiving the appellant's right to the proposed instruction. See Cohen, Sheppeard, and Paine, Tennessee Law of Evidence (1995) § 201.8, p.49 ("[s]ince a stipulation requires an agreement, one party's offer to stipulate does not create a stipulation; both parties must agree before a stipulation occurs). See also Ford, 725 S.W.2d at 691(emphasis in original)("[a] stipulation is an *agreement between counsel* with respect to business before the court"). Indeed, in light of defense

31

counsel's claim that their waiver of the appellant's right under Tenn. Code. Ann. § 40-35-201(b) was contingent upon the alleged stipulation, we find it curious that counsel made no attempt to clarify and confirm the existence and scope of the parties' agreement.  This issue is without merit.

**E.  Newly Discovered Evidence**

The appellant also contends that the trial court should have granted his Motion for New Trial due to the availability following the appellant's trial of another eyewitness to the appellant's offense.  Specifically, the appellant contends that Jimmy "J.J." Cullop was a fugitive from justice during his trial.  Subsequently, the police apprehended Mr. Cullop who was thereafter available to testify concerning the appellant's offense.  However, at the hearing on the appellant's Motion for New Trial, the appellant offered no proof concerning the content of Mr. Cullop's proposed testimony.

In order to obtain a new trial based upon newly discovered evidence, the appellant must establish: (1) reasonable diligence in attempting to discover the evidence; (2) the materiality of the evidence; and (3) that the evidence would likely change the result of the trial.  State v. Nichols, 877 S.W.2d 722, 737 (Tenn. 1994); State v. Caldwell, 977 S.W.2d 110, 116 (Tenn. Crim. App. 1997), perm. to appeal denied, (Tenn. 1998); State v. Perez, No. 03C01-9603-CC-00134, 1998 WL 851470, at *19 (Tenn. Crim. App. at Knoxville, December 10, 1998).  The decision to grant or deny a new trial on the basis of newly discovered evidence rests within the sound discretion of the trial court.  State v. Walker, 910 S.W.2d 381, 395 (Tenn. 1995); Caldwell, 977 S.W.2d at 117;  Perez, No. 03C01-9603-CC-00134, 1998 WL 851470, at *19.  In the instant case, the appellant has patently failed to demonstrate his right to a new trial or any abuse of discretion by the trial court.

32

**F.    Sufficiency of the Evidence**

Finally, the appellant challenges the sufficiency of the evidence supporting his conviction of reckless aggravated assault.  In Tennessee, appellate courts accord considerable weight to the verdict of a jury in a criminal trial.  In essence, a jury conviction removes the presumption of the defendant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).  The appellant must establish that no "reasonable trier of fact" could have found the essential elements of reckless aggravated assault beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal,  the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983).  In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts.  State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

As noted earlier, in order to commit reckless aggravated assault, a person must recklessly cause bodily injury to another, and the bodily injury must be serious.  Tenn. Code. Ann. § 39-13-102(a)(2)(A); Tenn. Code. Ann. § 39-13-101(a)(1).  Bodily injury "includes a cut, abrasion, bruise, burn or disfigurement; physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty . . . ." Tenn. Code. Ann. § 39-11-106(a)(2) (1995).  In contrast, serious bodily injury requires a substantial risk of death or extreme physical

33

pain. Tenn. Code. Ann. § 39-11-106(a)(34)(A) and (C). The distinction between bodily injury and serious bodily injury is a question of fact for the jury and not a question of law. State v. Barnes, 954 S.W.2d 760, 765-766 (Tenn. Crim. App. 1997).

Briefly revisiting the evidence adduced at trial and viewing the evidence in a light most favorable to the State, the record reflects that the appellant initiated a physical confrontation with his ex-wife in the parking lot of the Station Bar. During the course of the fight, Ms. Rush sprayed the appellant with pepper spray, whereupon the appellant withdrew a knife and stabbed her four times. One of the stab wounds penetrated Ms. Rush's liver, causing her liver to bleed into her abdominal cavity. She was placed in the intensive care unit of the Bristol Regional Medical Center and remained at the Medical Center for four days. We conclude that the record clearly reflects that the appellant recklessly caused Ms. Rush bodily injury. Moreover, we conclude that the evidence adduced at trial supported a finding that Ms. Rush's injuries both created a substantial risk of death and extreme physical pain. Tenn. Code. Ann. § 39-11-106-(a)(34)(A) and (C). Although Ms. Rush's vital signs remained within normal ranges, serious bodily injury does not require an imminent risk of death, only a substantial risk. Tenn. Code. Ann. § 39-11-106-(a)(34)(A). A rational juror could conclude beyond a reasonable doubt that the six centimeter stab wound which penetrated Ms. Rush's liver created a substantial risk of death. Moreover, while this court has conceded the difficulty of quantifying or measuring pain, the testimony at trial supported a conclusion that the pain caused by the four stab wounds was sufficiently severe to be placed in a class with an injury involving a substantial risk of death. State v. Sims, 909 S.W.2d 46, 49 (Tenn. Crim. App. 1995).

34

However, the appellant argues that the State failed to negate his argument at trial that he acted in self-defense.  Tenn. Code. Ann. § 39-11-611(a) (1997) sets forth the components of a defense of self-defense: (1) the victim used or attempted to use unlawful force against the accused; (2) the accused reasonably believed that he was threatened with imminent death or serious bodily injury, i.e., the belief was founded upon reasonable grounds; and (3) the danger of imminent death or serious bodily injury was real or the accused honestly believed that the danger was real at the time of the accused's threat or use of force.  "The [S]tate has the burden of proof to negate the defense; the burden is not upon the defendant to prove the defense exists."  State v. Belser, 945 S.W.2d 776, 782 (Tenn. Crim. App. 1996).  Whether the State has met its burden is a question for the jury to determine. State v. Clifton, 880 S.W.2d 737, 743 (Tenn. Crim. App. 1994); State v. Dean, No. 03C01-9508-CC-00251, 1997 WL 7550, at *6 (Tenn. Crim. App. at Knoxville, January 10, 1997).  We conclude that the record supports the jury's resolution of this issue in favor of the State.

Initially, the defense of self-defense is only applicable when the other party is using or attempting to use "unlawful force." Tenn. Code. Ann. 39-11-611(a). Given the trial court's full and complete instruction on the law of self-defense, a rational juror could have concluded beyond a reasonable doubt that Ms. Rush was lawfully defending herself against the appellant's assault when she sprayed the appellant with pepper spray, particularly in light of the appellant's statement that he was carrying a knife.[10]  See State v. Belser, 945 S.W.2d 776, 782 (Tenn. Crim. App. 1996)(while emphasizing the State's burden of negating the defense of self-defense

---

[10]The State in its brief also cites Tenn. Code. Ann. § 38-2-102 (1997), which provides that "[r]esistance sufficient to prevent [an] offense may be made by the party about to be injured to prevent an: (1) Offense against the party's person . . . ."  This provision is implicit in the statute setting forth the defense of self-defense.  The State's citation emphasizes the point that, when evaluating a claim of self-defense, a factor in the jury's analysis must be whether or not the State has proved beyond a reasonable doubt that the *victim's* conduct was lawful.

beyond a reasonable doubt, this court observed that the defense set forth in Tenn. Code. Ann. § 39-11-611(a) arises only when a defendant is protecting himself from *unlawful* force).

In any event, even assuming that Ms. Rush's act in spraying the appellant with pepper spray constituted "unlawful force," the evidence adduced at trial supported a finding beyond a reasonable doubt that the appellant provoked Ms. Rush's use of pepper spray and did not subsequently abandon the encounter or clearly communicate an intent to do so. Tenn. Code. Ann. § 39-11-601(d) (1997), See also State v. Alford, No. 02C01-9509-CC-00281, 1996 WL 551787, at *3 (Tenn. Crim. App. at Jackson, September 30, 1996), vacated in part on other grounds, State v. Alford, 970 S.W.2d 944 (Tenn. 1998)(because the appellant was the initial aggressor, self-defense was not justified unless he abandoned the encounter or clearly indicated to the victim the intent to do so). We acknowledge that, contrary to the testimony of the witnesses for the prosecution, Mr. Gross testified that Ms. Rush first verbally assailed the appellant and that, during the ensuing fight, he overheard the appellant exclaim, "[G]et away, stay back." Nevertheless, we will not reweigh the credibility of the witnesses at trial. Pruett, 788 S.W.2d at 561.

Finally, a rational juror could have concluded beyond a reasonable doubt that the appellant did not possess a reasonable belief that he was in imminent danger of death or serious bodily injury. The record does reflect that, in response to the appellant's initial assault and prior to the stabbing, Ms. Rush sprayed the appellant with pepper spray. Moreover, the record reflects that, at some point during the appellant's assault, he was blinded by the pepper spray. Further, defense counsel adduced testimony at trial that Ms. Rush had previously assaulted the appellant. However, the record is devoid of evidence that Ms. Rush had

previously inflicted upon the appellant bodily injury or threatened him with serious bodily injury or death. Additionally, the record is devoid of evidence that Ms. Rush, Ms. Crowe, or Mr. Cullop threatened the appellant on the night in question or were armed with anything more than pepper spray. Indeed, during the course of the fight, the only force applied against the appellant comprised Ms. Rush's use of the pepper spray and Ms. Crowe's repeated attempts to push or pull the appellant away from Ms. Rush. Additionally, although the appellant asserts that he was "outnumbered three to one," there is no evidence in the record that Mr. Cullop participated or attempted to participate in the fight in any way. To the contrary, the testimony at trial strongly suggests that Mr. Cullop fled as soon as the fight began. In all cases of self-defense, the force used must be reasonable, considering all of the circumstances. State v. Renner, 912 S.W.2d 701, 704 (Tenn. 1995). Again, considering all of the circumstances in this case, the jury was entitled to find that the appellant did not possess a reasonable belief in danger justifying the repeated stabbing of his ex-wife.

The appellant also contends that the State failed to negate beyond a reasonable doubt the defense of necessity. Tenn. Code. Ann. § 39-11-609 (1997) provides:

> *Except as provided in §§ 39-11-611-39-11-621,* conduct is justified if:
> (1) The person reasonably believes the conduct is immediately necessary to avoid imminent harm; and
> (2) The desirability and urgency of avoiding harm clearly outweigh, according to ordinary standards of reasonableness, the harm sought to be prevented by the law proscribing the conduct.

(Emphasis added). We initially question the applicability of this defense to a defendant's threat or use of force against another person in light of the introductory clause emphasized above. State v. Culp, 900 S.W.2d 707, 710 (Tenn. Crim. App.

37

1994)(although this court is not at liberty to choose or reject any particular defense for a particular offense, this prerogative does lie with the legislature). In any event, the record supports the jury's rejection of this defense. This issue is without merit.

### III. Conclusion

For the foregoing reasons, we affirm the judgment of the trial court.

_____
Norma McGee Ogle, Judge

CONCUR:

_____
Gary R. Wade, Presiding Judge

_____
Cornelia A. Clark, Special Judge